In the Matter of the Application of INTERNATIONAL
RAILWAY COMPANY, Appellant, v. WILLIAM S. RANN,
as Corporation Counsel of the City of Buffalo,
Respondent.

**Municipal corporations as legal entities and as collections of
individuals — rights of the city of Buffalo under the Milburn
agreement, providing for a five-cent fare on street railroads
— property rights — contract for the benefit of third parties —
referendum provisions of the charter of the city of Buffalo.**

1. The agreement between the city of Buffalo and the street rail-
roads known as the Milburn agreement, in providing for a five-cent
fare and abolishing transfer charges, confers rights in the nature of
property rights upon the city of Buffalo, both as a legal entity and
as a collection of individuals.

2. The provisions of the charter of the city of Buffalo for a refer-
endum on any "resolution disposing of any property or rights of the
city" apply to a resolution of the city council consenting to the
increase, of the rate of fare to be charged by the appellant from five
cents to six cents.

3. The individual inhabitants of Buffalo have the benefit of the
agreement for a five-cent fare while it remains in force and may
enforce it, but it may be modified with the consent of the local
authorities obtained in the manner provided by law. (*Gifford* v.
*Corrigan*, 117 N. Y. 257, distinguished.)

*Matter of International Ry. Co.* v. *Rann*, 185 App. Div. ——, affirmed.

(Argued July 12, 1918; decided July 12, 1918.)

APPEAL, by permission, from an order of the Appellate
Division of the Supreme Court in the fourth judicial
department, entered July 2, 1918, which affirmed an
order of Special Term denying a motion for a peremptory
writ of mandamus.

The facts, so far as material, are stated in the opinion.

*Henry W. Killeen, Thomas Penney* and *M. W. Weimar*
for appellant.   The question involved is not as to whether
the referendum provision of the Buffalo charter is a
wise provision; it does not involve a discussion or decision

of the value of direct legislation as compared with representative government; it does not quarrel with the referendum provision of the city charter; it seeks only to ascertain if that provision is applicable to the one particular resolution which is here in question. (L. 1914, ch. 217, § 31.) As used in section 31, the word "rights" means rights · of property, or rights partaking of the nature and substance of property. (*Matter of Tilden,* 98 N. Y. 434; *Magaffin* v. *Cohoes,* 74 N. Y. 387; *Coffin* v. *Reynolds,* 37 N. Y. 640; *Aikin* v. *Wassan,* 24 N. Y. 482; *People* v. *Hemleb,* 127 App. Div. 358.) The city, as such, has no property rights in the fare provision of the Millburn agreement or subsequent franchise grants; the rights are conferred only upon the citizens. (*Abraham* v. *Meyers,* 23 N. Y. Supp. 225; *Pond* v. *New Rochelle Water Co.,* 183 N. Y. 330.) In passing the resolution under consideration the city council did not dispose of any rights, either of property or otherwise; it exercised a contract-making power conferred upon the city by statute. (*Matter of Quinby,* 223 N. Y. 244; *Pond* v. *New Rochelle Water Co.,* 183 N. Y. 330.)

*William S. Rann, Corporation Counsel,* for respondent. In granting a franchise to occupy the streets the city acts in a representative capacity for each of its inhabitants. (*People ex rel.* v. *Kerr,* 27 N. Y. 188; *People ex rel.* v. *N. Y. R. Co.,* 217 N. Y. 310; *Eno* v. *Mayor, etc.,* 68 N. Y. 214.) By the resolution in controversy the city disposed of its right to object to the jurisdiction to the public service commission in a proceeding to be instituted by the company for a determination of the just and reasonable rate of fare to be collected during the war and for six months thereafter. (*Matter of Quinby* v. *P. S. Comm.,* 223 N. Y. 244.)

*George Clinton, John L. Romer, Ralph S. Kent* and *Joseph A. Wechter* for citizens and taxpayers of Buffalo.

Under the charter of the city of Buffalo the council agreement is subject to review by the people through the referendum. (L. 1914, ch. 217, § 31.)

POUND, J.   This is an application for a peremptory writ of mandamus directing the corporation counsel of the city of Buffalo to sign a stipulation of discontinuance of a franchise tax certiorari proceeding instituted by the appellant.   The controversy is over the construction of that portion of section 31 of the charter of the city of Buffalo (Laws of 1914, ch. 217, as amended by Laws of 1916, ch. 260) which reads as follows:   " No resolution of the council, appropriating money other than for the regular payrolls or to meet any legal obligation of the city, and no resolution incurring or providing for the incurring of any expenses, other than for repairs immediately necessary, * * * and no resolution disposing of any property or rights of the city, shall become effective until thirty days from its adoption; and its operation shall be suspended, and it shall be reconsidered and submitted to the electors, in the same manner as in this section provided for the suspension, reconsideration, and submission of any ordinance," as applied to resolutions of the council, adopted June 18, 1918, and assented to by the appellant, consenting to an increase in the rate of fare to be charged by appellant from five cents to six cents for each passenger in Buffalo, pending an investigation by the public service commission as to the just and reasonable rate to be charged during the present war and for six months thereafter.

The discontinuance of the franchise tax certiorari proceeding is provided for in the resolutions.   It is a mere incident to the adjustment of the prayer of the appellant for relief, but it has become a convenient resort to test the effectiveness of the resolutions in their main feature.

The street railway service in Buffalo was formerly

rendered by three corporations, each operating on its own lines and charging passengers an extra fare for the privilege of transferring to the cars of either of the other lines. Prior to 1892 the situation had become unsatisfactory both to the companies and their patrons, and an agreement was accordingly made between the city and the several companies, which is known as the Milburn agreement. Its chief purpose was to provide for a general transfer system between the street railroad companies and to provide the rate of compensation which they should pay the city for the enjoyment of their franchises. (*Kuhn* v. *Knight*, 190 N. Y. 339, 343.) It is dated January 1, 1892, and was executed in that month by the parties thereto. It. was afterwards ratified by the legislature (Laws of 1892, ch. 151), and is recognized as valid in section 93 of the Railroad Law. It regulates generally the relations between the city and the companies. The latter, among other things, agree to charge only five cents for transporting a passenger from any point on any of the lines to any other point on any of them by the most direct route. Transfer charges are abolished. All of the franchises which have been granted to any company now forming part of the International Railway Company, and all franchises granted to the International Railway Company since 1892 refer to and make the Milburn agreement a part of the grant and the five-cent fare is fixed in all of said franchises. Under existing law, before the rate can be changed, the consent of the city is necessary. The terms of this agreement having become onerous, the appellant sought such consent with the result indicated above.

The respondent contends that the agreement of the street railway. companies with the city of Buffalo to abolish transfer charges and charge a five-cent fare is *a right of the city.* If it is such a right, within the meaning of section 31 of the city charter, the resolutions dispose

of it and, therefore, are not effective until thirty days after their adoption and are subject to the vote of the electors of the city, if such a vote is demanded by five per centum of the electors. If it is not such a right, the resolutions are immediately effective and the writ of mandamus should issue.

The public service commission may, with the consent of the local authorities evidenced as provided by law, increase rates of fare previously agreed upon by street railroad corporations and the city. The regulations as to rates of fare are conditions upon which the railroads exercise their franchises. They are not immutable. (*Matter of Quinby* v. *Public Service Commission*, 223 N. Y. 244.)

The appellant does not question the power of the legislature to enact the referendum provision of the city charter, which has already passed the scrutiny of this court. (*Mills* v. *Sweeney*, 219 N. Y. 213, 218.)· With the merits of the request for the privilege to charge a six-cent fare we may not concern ourselves, nor are we called upon to indicate to what extent the legislature may go in regulating rates of fare in the city of Buffalo; neither are we asked to deal with the resolutions as " immediately necessary for the preservation of the public peace, health or safety." The charter (§ 31) excepts ordinances which bear on their face a recital of immediate necessity from the referendum.

We come at once to the heart of the controversy. Is the provision in the Milburn agreement for a five-cent fare a right of the city of Buffalo? That which is directed by law for one's protection and advantage is said to be one's right. The rate of fare provision of the Milburn agreement, unquestionably secures valuable rights to the inhabitants of Buffalo which they did not previously possess. The city owing or assuming to owe to its inhabitants, the patrons of the street railroad companies, the

duty of obtaining more favorable rates, entered into an agreement for their benefit which they may enforce. (*Pond* v. *New Rochelle Water Co.*, 183 N. Y. 330, 338; *Rigney* v. *N. Y. C. & H. R. R. R. Co.*, 217 N. Y. 31.) The nature, from a legal standpoint, of such an agreement is well stated in *Adams* v. *Union R. R. Co.* (21 R. I. 134). A town had made an agreement with the defendant railroad company for a five-cent rate of fare. The question was whether plaintiff, a passenger, could claim the benefit of the contract. The court said: " The contract in question was made for the benefit of passengers using the defendant's cars. The town can hardly show damages for its breach and therefore if the people for whose benefit it was made cannot recover for its breach, no one can. True the town might take steps to avoid the contract and stop the road for failure to perform conditions; but, in so doing, it would cut off the privilege of the many to redress the wrong of one. This would neither be a reasonable nor an adequate remedy. It must have been intended to be a contract for the benefit of the public, made through their corporate representative, upon which passengers could rely, and for breach of which they could seek redress; otherwise, it is a contract of little obligation and force."

The agreement confers rights upon the city of Buffalo. The city may terminate it for non-performance or it may release the railroad companies from performance or consent to modify its terms, or it may compel performance by suit. (*Wash. Co. Water Co.* v. *Hagerstown*, 116 Md. 497.) The city is the real party to the agreement. The individual inhabitants are not, nor can they become, parties thereto. They merely have the benefit of it while it remains in force. The rule as to private contracts (*Gifford* v. *Corrigan*, 117 N. Y. 257) can have no application to contracts like this which are primarily municipal regulations. (*Little Rock R.*

& E. Co. v. *Dowell*, 101 Ark. 223; Ann. Cas. 1913
D 1086.)   If that rule were to be applied here, the rate
of fare could not be raised without the consent of every
one who rode on the street cars, and the city would have
no legal right to consent to modify the terms of the
agreement.   But the rights of the municipal corporation
as a legal entity are mainly formal in their character except
so far as it pays the carfare of its own employees.   The
substantial rights are the rights of the inhabitants of the
city, not of the civil division of the state which exists
for governmental and public purposes.   A municipal
corporation consists, however, of both territory and
inhabitants.   As a legal conception, the corporation is
an entity distinct from its inhabitants, but it remains
a local community; a body of persons; the sum total of
its inhabitants and the proper custodian and guardian
of their collective rights.   " Every municipal corporation
has a two-fold character, the one governmental, the other
private." (19 R. C. L. 697.) In its governmental
capacity it may command; in its private character, as
a collection of individuals, it must sometimes barter
and bargain.   The Milburn agreement is the result of
bargaining between the people of the city of Buffalo,
represented by the municipal authorities on one hand,
and the street railroad companies on the other.

The words " property and rights of the city " may
well be limited to property and rights in the nature of
property (See, however, *Barber A. P. Co.* v. *Field,*
134 Mo. App. 663), but the right of the inhabitants of
the city of Buffalo to ride on the street railroad for
a five-cent fare is a property right; a right enforcible in
the courts, not depending upon another's courtesy or for-
bearance.   By the use of " a convenient fiction " (*People*
v. *North River S. R. Co.,* 121 N. Y. 582, 622) it may
be plausibly pressed that such rights are not the rights
of the city of Buffalo, but if we look at the substance of

things we must conclude that the common rights of the inhabitants of the city, secured through the agency of the city officials, are rights of the city and that the resolutions of the council thus modifying the Milburn agreement through the same agency come peculiarly within the description of resolutions " disposing of rights of the city." They make an end to the present five-cent fare and add twenty per cent to the burdens of '.the traveler. Few rights of property are of more immediate concern to a greater proportion of the population than the right to ride on the street cars for a small sum. It follows that such resolutions are subject to the referendum provision of the charter which controls the general provisions of the General City Law.

The order appealed from should be affirmed, with costs.

HISCOCK, Ch. J., HOGAN, CARDOZO, McLAUGHLIN and ANDREWS, JJ., concur; CRANE, J., votes to dismiss appeal.

Order affirmed.